# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| TALISHA L. ROSEN-KELLOGG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 22-cv-3028 (RBW) |
| | ) | |
| ALEJANDRO MAYORKAS, Secretary, | ) | |
| U.S. Department of Homeland Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

The plaintiff, Talisha L. Rosen-Kellogg, brings this civil action against the defendant, Alejandro Mayorkas, in his official capacity as Secretary of the United States Department of Homeland Security ("DHS"), asserting claims of: (1) failure to provide a reasonable accommodation for her disability, in violation of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. §§ 701–795, see Amended Complaint ("Am. Compl.") ¶ 20, ECF No. 2; (2) discrimination based upon her disability, in violation of the Rehabilitation Act, 29 U.S.C § 794, see id. ¶ 21; and (3) retaliation, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-3(a), and the Rehabilitation Act, 29 U.S.C. §§ 701–795, see id. ¶ 22. Currently pending before the Court is the Defendant's Motion to Dismiss ("Def.'s Mot." or the "defendant's motion"), ECF No. 6, pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]  Upon

---

[1] The Court notes that, in her opposition to the defendant's motion, "the [p]laintiff move[s] for leave to [a]mend her Complaint[,]" Plaintiff's Opposition to Defendant's Motion to Dismiss ("Pl.'s Opp'n") at 2 n.1, ECF No. 8, "[i]f the Court deems [ ] additional facts [she has alleged for the first time in the opposition] need to be included in the Complaint[,]" id., which the Court will address infra Section III.C.3.a.

careful consideration of the parties' submissions,[2] the Court concludes for the following reasons that it must grant in part and deny without prejudice in part the defendant's motion.

## I.     BACKGROUND

**A.     Factual Background**

In 2011, the plaintiff, Talisha L. Rosen-Kellogg, "obtained a GS-14 Management and Program Analyst position with the [United States] Citizenship and Immigration Services (['USCIS']) at [the United States Department of Homeland Security.]"  Am. Compl. ¶ 8.  In 2019, the plaintiff "began working in the area of contracting with [the] Financial Management Branch of [US]CIS's Mission Support Division," id., and at an unspecified time began working "as a Management and Program Analyst [and] Information Management Analyst in Fraud Detection and National Security[,]" id. ¶ 5, until "she was involuntarily terminated from that employment on December 7, 2021," id.  Prior to her employment at USCIS, the plaintiff worked in various roles for the United States Coast Guard until she "suffered massive physical and mental injuries as a result of her duties during Hurricane Katrin[a]."  Id. ¶ 7.  The plaintiff states that she was "judged to be [ninety] percent disabled by the [United States] Department of Veterans Affairs[—seventy] percent for mental health due to anxiety, depression and panic attacks, [fifty] percent disabled for migraines, and [ten] percent for degenerative disc disease, back pain, ankle and knee injuries[,] and anemia."  Id.

The plaintiff alleges that "[t]he degenerative disc disease affects her ability to sit for long periods of time and she cannot carry more than [twenty] pounds[,]" and that "her mental health disabilities make her interpersonal and social interactions with others ([co-workers] included)

---

[2] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Plaintiff's Opposition to Defendant's Motion to Dismiss ("Pl.'s Opp'n"), ECF No. 8; and (2) the Defendant's Reply in Support of Motion to Dismiss ("Def.'s Reply"), ECF No. 9.

difficult as she is prone to be both irritable and blunt." Id. ¶ 9.  Furthermore, the plaintiff alleges

that her "mental health difficulties adversely affect her memory, [ ] make it easy for her to mis-

communicate[,] and create misunderstandings with others, including [her co-workers]." Id.  The

plaintiff states that "she suffers panic attacks from her anxiety[,] which result in her failure to

complete tasks or follow through on matters that are stressful[,]" and that

> her disabling depression cause[s] her to[,] at time[s,] allow her personal hygiene
> to slip, while her migraines make it difficult for her to move without pain and
> force[] her[,] at time[s][,] to sit in a darkened room in order to recover, all of
> which have cause[d] her accuracy in spelling and task completion to suffer.

Id.  However, the plaintiff contends that "with reasonable accommodations, [she] performed the

essential duties of her position . . . in a satisfactory manner." Id.

During the relevant period concerning the matters involved in the Amended Complaint—

March 2016 to May 2021—the plaintiff reported to various supervisors. See id. ¶ 11.  The

plaintiff "reported to Fabienne Corcoran []from March 2016 to March 2017[], . . . to Jared

Espenschied []from April 2018 to December 2019[], Kalika France and Stefan Deseo []from

December 2019 to May 2020[], and Marlin Ruhl . . . [from] mid-May 2020 [until the plaintiff's

termination]." Id.  "All of these officials were at the time they supervised [the] plaintiff

Supervisory Management and Program Analysts." Id.  "From the period [of] March 2017 to

February 2020, [the] plaintiff's second-line supervisor was Fabienne Corcoran . . . and her third-

line supervisor from July 2019 onward was Jessica McAllum[.]" Id.  The plaintiff contends that

"[a]ll of these [US]CIS officials and [their] successors were aware of [the] plaintiff's disabilities

either by her informing them, their being informed by the fellow managers, or their role in

dealing with [the] plaintiff's requests for reasonable accommodations." Id.

In 2018, "[the] plaintiff was a witness . . . in an administrative [Equal Employment

Opportunity (']EEO[')] complaint brought by a co-worker at [US]CIS." Id. ¶ 10.  The plaintiff

alleges that "Fabienne Corcoran was fully awar[e] of [the] plaintiff's protected activity of being [a] witness . . . as [Ms. Corcoran] was the person accused of discrimination in [the] earlier complaint[.]"  Id. ¶ 11.  Additionally, the plaintiff "complained to her supervisor that [a]gency management was improperly using Skype as an attendance tool for her as a disabled person working from home[,]" id. ¶ 10, and alleges that Ms. Corcoran "was fully awar[e] of [the] plaintiff's disabilities[] and was copied on her complaints regarding the abuse of Skype," id. ¶ 11.  Furthermore, the plaintiff alleges that all of the USCIS officials listed above were "aware of [the plaintiff] protesting . . . [the] us[e of] Skype as an attendance tool against her as a disabled person[.]"  Id.

> Sometime before May 7, 2021, the defendant's
>
> management had [ ] investigated [ ] allegations that [the plaintiff] was working remotely for the agency other than from her home, that she was engaged in a private real estate business as a broker, used government equipment . . . for that real estate brokerage business, and that she engaged in that business while on government time.

Id. ¶ 13.  In regards to the investigation, the plaintiff alleges that "she occasionally used her agency-provide[d] mobile phone to make personal calls, including calls related to her personal real estate transactions[,]" but that "[t]his use of government equipment was minimal[, ] in keeping with that which is allowable under agency policy[,]" and "largely [occurred] during her break times[.]"  Id. ¶ 14.  Similarly, the plaintiff represents that regarding her "engaging in real estate transactions, she did so during her employment with the agency, but it was never as an operator of a business[,]" and instead was "all for her [ ] personal account[.]"  Id. ¶ 15.  Furthermore, the plaintiff contends that she "sometimes worked for the agency remotely [at her second home], as it at times provided her with a more relaxed atmosphere than [ ] her primary residence[.]"  Id. ¶ 16.

The plaintiff alleges that "[d]ue to her disabilities, [she] was stripped of her ability to have a government[-]issued mobile telephone although it was provided to her as part of the reasonable accommodations for her disabling conditions." Id. ¶ 12. Furthermore, the plaintiff alleges that she "became the subject of gossip and speculation among her co-workers regarding how she spent her time and her personal activities." Id. ¶ 13. The plaintiff complained to her supervisors about the removal of the government-issued phone "as part of [what she alleged to be] continuing disability discrimination and retaliation for her participation in the earlier EEO complaint . . . and her own complaints" regarding "management using Skype as a devi[c]e to monitor [the plaintiff's] time and attendance as a disabled person working from home as [part of] an accommodation." Id. ¶ 12.

On May 7, 2021, the plaintiff's supervisors issued "her a notice of proposed removal from her position[.]" Id. ¶ 17. The plaintiff alleges that Marlin Rule was "the official [who] propose[d the] plaintiff's firing in May of 2021[ ,]" id. ¶ 11, and that "[t]his was done despite the fact that [the] plaintiff had no prior disciplinary record, was a wholly satisfactory employee, and had tried to explain the facts [regarding the real estate transactions] to the person investigating the allegations made against her," id. ¶ 17 (internal quotation marks omitted). "[T]he initial allegations [regarding the plaintiff's real estate transactions] [ ] were investigated and found to be justification for firing [the] plaintiff[, in addition to her] lack[ of] candor in explaining herself during the investigation." Id. (internal quotation marks omitted). On November 30, 2021, the plaintiff's "immediate management initially fired her on the basis of [the] May 7, 2021 proposed removal[.]" Id. Subsequently, after the plaintiff's union representative had "raised issues regarding the efficacy of the November 30[, 2021] decision to remove [the] plaintiff[,] . . . the matter was sent to a more senior management official in her unit[.]" Id. ¶ 18. The plaintiff

alleges that this official "had [ ] also been involved in her disability discrimination claim[.]"  Id.

"That official rescinded the November 30, 2021 decision to remove [the] plaintiff, but at the

same time affirmed the removal decision for the same reasons[,] . . . making the date for [the]

plaintiff's firing and removal from the federal service December 7, 2021."  Id. (internal quotation

marks omitted).  The plaintiff alleges that

> Jessica McAllum[,] the official who decided to terminate[] [the] plaintiff's
> employment and remove her from the federal service [on] December 6, 2021[,] [ ]
> was fully informed as to [the] plaintiff's disabilities[,] . . . was . . . the deciding
> official on [the] plaintiff's last requests for reasonable accommodations, and
> participated in the pre-complaint mediation of [the] plaintiff's claims[, all prior to
> her being the deciding official on [the] plaintiff's firing[.]

Id. ¶ 11.

## B.    Procedural Background

The plaintiff filed her initial Complaint in this case on October 6, 2022, see Complaint

("Compl.") at 1, ECF No. 1, and subsequently filed an Amended Complaint that is now the

operative complaint in this case on that same date, see Am. Compl. at 1.  On January 10, 2023,

the defendant filed his motion to dismiss.  See Def.'s Mot. at 1.  The plaintiff filed her opposition

on February 14, 2023, see Pl.'s Opp'n at 1, and the defendant filed his reply in support of his

motion on February 21, 2023, see Def.'s Reply at 1.

## II.    STANDARD OF REVIEW

A Rule 12(b)(6) motion tests whether a complaint "state[s] a claim upon which relief can

be granted[.]"  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss [under Rule 12(b)(6)], a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp.

v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads

factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

In evaluating a motion to dismiss under Rule 12(b)(6), "the Court must construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." Hettinga v. United States, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted). While the Court must "assume [the] veracity" of any "well-pleaded factual allegations" in a complaint, conclusory allegations "are not entitled to the assumption of truth." Iqbal, 556 U.S. at 679. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678 (citing Twombly, 550 U.S. at 555). Also, the Court need not "accept legal conclusions cast as factual allegations[,]" or "inferences drawn by [the] plaintiff if those inferences are not supported by the facts set out in the complaint[.]" Hettinga, 677 F.3d at 476. Finally, the Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the Court] may take judicial notice." Equal Emp. Opportunity Comm'n v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

### III.    ANALYSIS

The defendant argues that the Amended Complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) because: (1) regarding the plaintiff's failure to accommodate claim, she "does[ not] describe a request for the mobile phone as an accommodation or how her physical limitations necessitated the need for the phone versus other accommodations [like Skype,]" Def.'s Mot. at 1; (2) the plaintiff's disability discrimination and retaliation claims "are subject to dismissal[ because] permitting [co-workers] to 'engage in gossip' and requiring [the] use of Skype to monitor [the plaintiff's] remote attendance are not

adverse actions" and the plaintiff "does not plead any facts that make it plausible that discrimination or retaliation was at play in these events," id. at 2; and (3) "[the p]laintiff's retaliation claim fails because there exists too wide a temporal gap between [the p]laintiff's prior protected activity and the agency's actions significantly later" and because the plaintiff failed to show that her "supervisors harbored any discriminatory or retaliatory animus[,]" id.  In response, the plaintiff argues that: (1) "[t]he [f]acts in the [Amended] Complaint [a]re [s]ufficient to [s]upport a [f]inding [t]hat [the d]efendant [f]ailed to [a]ccommodate [the p]laintiff's [d]isabilities," Pl.'s Opp'n at 12, and (2) "[t]he [f]acts [d]escribed in the [Amended] Complaint [w]ould [s]upport a [f]inding that [the d]efendant [b]oth [d]iscriminated [a]gainst [the plaintiff] [b]ecause of [h]er [d]isabilities and [r]etaliated [a]gainst [h]er [w]hen it [t]erminated [h]er [e]mployment[,]" id. at 14.  The Court will first consider each of the plaintiff's claims in turn and will then consider the plaintiff's request for leave to amend her Amended Complaint, contained in her opposition to the defendant's motion to dismiss.

A.    **Whether the Plaintiff Has Stated a Failure to Accommodate Claim Under the Rehabilitation Act**

The Court first considers the plaintiff's claim that the defendant failed to provide her reasonable accommodations in light of her disability.  See Am. Compl. ¶ 20.  The plaintiff alleges that "[i]n refusing [and] failing to provide [her] or to continue to provide her with the reasonable accommodation[] of a mobile phone, [the] defendant, through management at [US]CIS," violated the Rehabilitation Act.  Id.  In his motion, the defendant argues that the plaintiff "is unable to demonstrate (and pleads no facts to support) a finding that the purported request for a cell phone was reasonable considering [the p]laintiff's disabilities, and [the p]laintiff fails to raise a plausible inference that a cell phone was necessary to perform the essential functions of her job."  Def.'s Mot. at 8.

The Rehabilitation Act, which incorporates the standards of the Americans with Disabilities Act ("ADA"), requires employers to make reasonable accommodations "to the known physical or mental limitations of an otherwise qualified individual with a disability who is an [ ] employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship[.]"  42 U.S.C. § 12112(b)(5)(A); see Minter v. District of Columbia, 809 F.3d 66, 69 (D.C. Cir. 2015) (applying ADA standards to a claim under the Rehabilitation Act).  For the plaintiff to establish a prima facie case of failure to accommodate, she must show "(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." Brown v. Snow, 407 F. Supp. 2d 61, 67 (D.D.C. 2005) (internal quotation marks and emphasis omitted) (quoting Scarborough v. Natsios, 190 F. Supp. 2d 5, 19 (D.D.C. 2002)).  "[A]n employer is not required to provide an employee th[e] accommodation [she] requests or prefers, the employer need only provide some reasonable accommodation."  Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1305 (D.C. Cir 1998) (quoting Gile v. United Airlines, Inc., 95 F.3d 492, 499 (7th Cir. 1996)).  "The employee has the burden of identifying reasonable accommodations, and the [employer] has the burden of showing undue hardship."  Graffius v. Shinseki, 672 F. Supp. 2d 119, 126 (D.D.C. 2009).

The Rehabilitation Act defines reasonable accommodations as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position[,]" 29 C.F.R. § 1630.2(o)(1)(ii), and essential functions are defined as "the fundamental job duties of the employment position the

individual with a disability holds[,]" 29 C.F.R. § 1630.2(n)(1).  Furthermore, the Rehabilitation

Act defines a qualified individual as one who "satisfies the requisite skill, experience, education,

and other job-related requirements of the employment position such individual holds or desires

and, with or without reasonable accommodation, can perform the essential functions of such

position."  29 C.F.R. § 1630.2(m).  Finally, the Rehabilitation Act defines undue hardship as

"significant difficulty or expense incurred by [an employer.]"  29 C.F.R. § 1630.2(p).

The defendant does not contest that the plaintiff has adequately alleged the first two

elements of her prima facie reasonable accommodation claim, i.e., that the plaintiff had a

disability within the meaning of the statute and that the defendant knew about the plaintiff's

disability.  See Def.'s Mot. at 12 n.1; 29 U.S.C. § 705(20)(A) (providing the definition of an

individual with a disability).  However, the parties disagree as to whether the plaintiff needed the

government-issued cell phone to perform the essential functions of her position.  See Am.

Compl. ¶ 20; Def.'s Mot. at 11.  Regarding what constitutes an essential function, the Code of

Federal Regulations provides that

> [e]vidence of whether a particular function is essential includes, but is not limited
> to: (i) [t]he employer's judgment as to which functions are essential; (ii) [w]ritten
> job descriptions prepared before advertising or interviewing applicants for the job;
> (iii) [t]he amount of time spent on the job performing the function; (iv) [t]he
> consequences of not requiring the incumbent to perform the function; (v) [t]he
> terms of a collective bargaining agreement; (vi) [t]he work experience of past
> incumbents in the job; and/or (vii) [t]he current work experience of incumbents in
> similar jobs.

29 C.F.R. § 1630.2(n)(3).  Here, after taking into account the relevant considerations as defined

in the Code of Federal Regulations, see id., the Court concludes that the plaintiff has failed to

adequately allege that she needed a cell phone to perform the essential functions of her position.

See Congress v. Gruenberg, No. 19-cv-1453 (CKK), 2022 WL 17356878, at *6–9 (D.D.C. Dec.

1, 2022) (relying on the § 1630.2(n)(3) factors, such as a written job description and the amount

of time spent on the job performing the function, to determine whether Adobe CQ assignments were an essential function of the plaintiff's job).

In her Amended Complaint, the plaintiff represents that she was permitted to "work[] from home as part of a reasonable accommodation," Am. Compl. ¶ 13, but she never explains why she needed to have a government issued mobile cellphone to perform her duties.  See generally Am. Compl.  Rather, in her Amended Complaint, the plaintiff merely states that "she occasionally used her agency-provide[d] mobile phone to make personal calls, including calls related to her personal real estate transactions," and that "[t]his use of government equipment was minimal[,]" id. ¶ 14, without providing any basis to conclude that she needed the government-issued cell phone to perform the essential functions of her position, see generally id.

However, in her opposition to the defendant's motion to dismiss, the plaintiff represents that "[a]s a part of the 2016 reasonable accommodation, which allowed [the p]laintiff to work full-time from home, [the defendant] also provided [the p]laintiff with a cell phone to facilitate her working from home[,]" but "[i]n late 2019, [the defendant] took action against [her] by depriving her of the government cell phone that she had used for three years and needed to do her job."  Pl.'s Opp'n at 5–6.  Allegedly, "[t]he cell phone was an essential tool for [the p]laintiff when she worked at home because she was not allowed to use her personal phone to perform government work even though her duties as a Program Analyst required her to respond to complex inquiries regarding the Federal Travel Regulation, Federal Government credit card usage and to support the OHS Fraud Detection National Security Leadership Conference by making travel arrangements and providing travel trips."  Id. at 5.  More specifically, the plaintiff states that "when a simple phone call would have sufficed to address all of the issues raised by a question, [she] was forced to engage in email exchanges that were sometimes not as productive."

Id.  Furthermore, she claims that "[t]he cell phone was also necessary when she had to change her email message settings to indicate that she was 'out of the office.'  With the cell phone she could change the settings in seconds, but without the cell phone she had to work through logging onto the DHS system, a cumbersome process that was difficult for her to manage when she was experiencing a migraine headache."  Id. at 5–6.  Accordingly, the plaintiff represents that "the denial of the cell phone adversely affected her ability to perform the essential functions of her job."  Id. at 6.  The defendant states that "there is no disagreement that [it] provided [the p]laintiff with full-time telework as a reasonable accommodation, which was necessary for [her] to perform the essential functions of her position considering her disabilities.  The same cannot be said for [the p]laintiff's request for a cell phone."  Def.'s Reply at 6.  The Court agrees with the defendant.

While the plaintiff expresses employment frustrations—namely, "being forced to engage in email exchanges that were sometimes not as productive" as making "a simple phone call[,]" or having to endure a "cumbersome" process of logging onto the agency's system "to change her email message settings," Pl.'s Opp'n at 5–6—these inconveniences do not establish that the plaintiff "could [not] perform the essential functions of [her] position" without a cell phone.  Brown, 407 F. Supp. 2d at 67.  Indeed, in her opposition brief, the plaintiff even concedes that reasonable alternatives existed to perform her essential functions—i.e., "engag[ing] in email exchanges" and "logging onto the [agency's] system" to change her email message settings.  Pl.'s Opp'n at 5–6.  "The government is not obligated under the [Rehabilitation Act] to provide [the] plaintiff with every requested accommodation, but only with reasonable accommodation as is necessary to enable her to perform her essential functions."  Goodman v. Potter, 412 F. Supp. 2d 11, 17 (D.D.C. 2005).  Thus, as the defendant notes, while "[the p]laintiff might have

preferred a cellphone, [ ] USCIS was not required to provide her the accommodation of her

choosing . . . [but rather] reasonable accommodations, as required."  Def.'s Mot. at 11 (citing

Aka, 156 F.3d at 1305).  And here, "there is no disagreement that [the defendant] provided [the

p]laintiff wi[th] full-time telework as a reasonable accommodation, which was necessary for

[her] to perform the essential functions of her position considering her disabilities."  Def.'s Reply

at 6.

Accordingly, the Court concludes that the plaintiff has failed to "plead sufficient facts to

show a plausible entitlement to relief," Rodriguez v. Donovan, 922 F. Supp. 2d 11, 17 (D.D.C.

2013), regarding her failure to accommodate claim, and the Court must therefore grant the

defendant's motion to dismiss Count I of the plaintiff's Amended Complaint.[3]

## B. Whether the Plaintiff Has Stated a Claim of Discrimination Based Upon Her Disability Under the Rehabilitation Act

The Court next addresses the plaintiff's disability discrimination claim.  Count II of the

plaintiff's Amended Complaint alleges that the defendant violated the Rehabilitation Act by: (1)

"mistreating [the] plaintiff on the job" by "unfairly allowing her to be the object of gossip and

false allegations of misconduct by co-workers[;]" (2) "using Skype as a time clock for [the]

plaintiff as a disabled employee working remotely[;]" (3) "proposing to fire [the] plaintiff and

---

[3] Furthermore, even if the plaintiff were correct that the cell phone was a necessary accommodation for her disability, the plaintiff's Amended Complaint itself provides a reasonable and non-discriminatory explanation for the defendant's decision to revoke her possession of the phone.  Specifically, the plaintiff concedes that "she occasionally used her agency-provide[d] mobile phone to make personal calls, including calls related to her personal real estate transactions[,]" and that "her management had her investigated on allegations that she was . . . engaged in a private real estate business as a broker, used government equipment (i.e., her government issued computer and mobile phone) for that real estate brokerage business, and that she engaged in that business while on government time."  Am. Compl. ¶¶ 13–14.  Based on the plaintiff's own representations, she provides adequate justification for denying her continued use of the government issued cellphone, id. ¶ 14, which precludes the Court from concluding that the revocation of the plaintiff's requested accommodation was related to her disability.  Stated another way, the defendant's decision to revoke the plaintiff's possession of the phone was not a violation of the Rehabilitation Act.  See, e.g., Woodruff v. Peters, 482 F.3d 521, 531 (D.C. Cir. 2007) (affirming the district court's decision that the defendant did not violate the Rehabilitation Act because "[e]ven if the finder of fact were to credit all of [the plaintiff's] evidence, there would be no basis for rejecting the presumptive validity of [the defendant's] explanation as to [its] employment actions").

remove her from federal service[] and otherwise mistreating and bullying [the plaintiff;]" and (4) "ultimately firing [the plaintiff] from her GS-14 position and removing [the plaintiff] from the federal service in December 2021."  Am. Compl. ¶ 21.  Furthermore, the plaintiff alleges that the adverse employment actions occurred "because [the plaintiff] was disabled[.]"  Id.  In response, the defendant argues that the plaintiff "fails [to] show a causal connection between [the alleged adverse] actions and a discriminatory animus[, and] [a]ccordingly [the p]laintiff's disability discrimination claims should be dismissed."  Def.'s Mot. at 16.

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her [ ] disability, . . . be subjected to discrimination" by a federal agency.  29 U.S.C. § 794(a).  And, "[w]hen courts evaluate whether the federal government has satisfied its obligations under the Rehabilitation Act, they apply the standards of the [ADA]."  Welch v. Skorton, 299 F. Supp. 3d 102, 108 (applying ADA standards to claims under the Rehabilitation Act); see Baloch v. Kempthorne, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (applying Title VII's adverse-action standards to claims under the Rehabilitation Act); Bain v. Off. of Att'y Gen., No. 21-cv-1751 (RDM), 2022 WL 17904236, at *19 (D.D.C. Dec. 23, 2022) (explaining that the D.C. Circuit has long interpreted the relevant portions of the Rehabilitation Act in accordance with Title VII).

To establish a prima facie case of disability discrimination under the Rehabilitation Act, the plaintiff must allege that "(1) she was a qualified individual with a disability, (2) her employer knew of her disability, and (3) she suffered an adverse employment action because of her disability."  Congress v. District of Columbia, 324 F. Supp. 3d 164, 175 (D.D.C. 2018). Neither party disputes the fact that the plaintiff was a qualified individual within the meaning of the Act and that the defendant knew of her disability.  See Def.'s Mot. at 12 n.1; 29 U.S.C. §

705(20)(A) (providing the definition of an individual with a disability).  Accordingly, the

"essential elements of a discrimination claim" that this Court must analyze are whether "[(1)] the

plaintiff suffered an adverse employment action [(2)] because of the plaintiff's . . . disability."

Baloch, 550 F.3d at 1196.  While "[a] plaintiff[] need not establish a prima facie case of

discrimination to survive a motion to dismiss[,] '[c]ourts can . . . explore a plaintiff's prima facie

case at the dismissal stage to determine "whether the plaintiff can ever meet her initial burden to

establish a prima facie case."'"  Redmon v. U.S. Capitol Police, 80 F. Supp. 3d 79, 86 (D.D.C.

2015) (emphasis omitted) (quoting Hutchinson v. Holder, 668 F. Supp. 2d 201, 211–12 (D.D.C.

2009)); see also Ervin v. Howard Univ., 562 F. Supp. 2d 58, 70 (D.D.C. 2008) ("A plaintiff is

not required to plead a prima facie case . . . in the complaint; however, the alleged facts must

support such a claim.").

      An adverse employment action is "a significant change in employment status, such as

hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a

decision causing significant change in benefits."  Redmon, 80 F. Supp. 3d at 86 (quoting Taylor

v. Small, 350 F.3d 1286, 1293 (D.C. Cir. 2003)).  Prior to this Circuit's recent decision in

Chambers v. District of Columbia, 35 F.4th 870, 882 (D.C. Cir. 2022) (en banc), if an action was

"not presumptively adverse, such as hiring and firing, an employee must [have] experience[d]

materially adverse consequences affecting the terms, conditions, or privileges of employment or

future employment opportunities such that a reasonable trier of fact could find objectively

tangible harm[,]" Redmon, 80 F. Supp. 3d at 87 (internal quotation marks omitted) (quoting

Douglas v. Donovan, 559 F.3d 549, 552 (D.C. Cir. 2009)); see Brown v. Brody, 199 F.3d 446,

457 (D.C. Cir. 1999) (setting forth the "objectively tangible harm" requirement for an adverse

action under the Title VII anti-discrimination provisions).  However, recently the Circuit in

Chambers rejected the "objectively tangible harm" requirement, explaining that "[o]nce it has been established that an employer has discriminated against an employee with respect to that employee's terms, conditions, or privileges of employment because of a protected characteristic, the analysis is complete."  Chambers, 35 F.4th at 874–75 (internal quotation marks omitted); see Bain, 2022 WL 17904236, at *19 (concluding that applying Chambers to the Rehabilitation Act is the "better approach" in an adverse action analysis rather than pre-Chambers authority). However, the Circuit has cautioned that "the phrase is not without limits—not everything that happens at the workplace affects an employee's terms, conditions, or privileges of employment[.]"  Id. at 874 (internal quotation marks omitted).

As to the second element of a prima facie case of discrimination based upon a plaintiff's disability, "despite the similarities between the Rehabilitation Act and the ADA, there is an established exception[,]" namely, "the plain language of the Rehabilitation Act imposes a stricter causation standard than the ADA."  Drasek v. Burwell, 121 F. Supp. 3d 143, 154 (D.D.C. 2015). The ADA prohibits discrimination against an employee "on the basis of disability[,]" 42 U.S.C. § 12112, whereas the Rehabilitation Act prohibits discrimination against an employee "solely by reason of [his or] her [ ] disability[,]" 29 U.S.C. § 794(a); see Drasek, 121 F. Supp. 3d at 154 (concluding that, while a discrimination claim "brought under the ADA can rest on a 'motivating factor' causation analysis—meaning that the claim can be sustained if discriminatory animus is merely one of several factors that precipitated the adverse employment action[,]" the proper analysis under the Rehabilitation Act "cannot be satisfied by a motivating factor test; rather, the applicable analysis is the traditional 'but-for' causation standard" because of the presence of the word "solely").  Thus, the proper analysis to be applied in this case is the "but-for" causation standard whereby the disability must be "the reason that the employer decided to act."  Drasek,

121 F. Supp. 3d at 154 (internal quotation marks omitted) (quoting Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176 (2009)).

Based on the analysis the Court must conduct, the plaintiff has failed to plead facts sufficient to support a plausible entitlement to relief for discrimination based upon her disability under the Rehabilitation Act for two reasons.  First, other than her proposed and actual termination in December 2021, which are the type of actions considered presumptively adverse, see Douglas, 559 F.3d at 554 (describing termination as an "obvious" adverse action); Redmon, 80 F. Supp. 3d at 87 (explaining that an action such as firing is "presumptively adverse"), the plaintiff has not demonstrated that she suffered an adverse employment action.  Second, the plaintiff has not pleaded sufficient facts to show that the defendant terminated her employment because of her disability.  Cf. Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993) ("Whatever the employer's decision[-]making process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome.").  The Court will address each of these conclusions in turn.

## 1.  Whether the Plaintiff Has Alleged Adverse Actions

The plaintiff alleges the following adverse actions purportedly taken by the defendant: (1) "mistreating [the] plaintiff on the job" by "unfairly allowing her to be the object of gossip and false allegations of misconduct by co-workers[;]" (2) "using Skype as a time clock for [the] plaintiff as a disabled employee working remotely[;]" (3) "proposing to fire [the] plaintiff and remove her from federal service[] and otherwise mistreating and bullying [the plaintiff;]" and (4) "ultimately firing [the plaintiff] from her GS-14 position and removing [the plaintiff] from the federal service in December 2021[.]"  Am. Compl. ¶ 21.

First, regarding the plaintiff's allegation that the defendant "unfairly allow[ed] her to be the object of gossip and false allegations of misconduct by co-workers[,]" id., the Court

concludes that this alleged action did not affect the "terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1); cf. Welch, 299 F. Supp. 3d at 113 (holding that an employer criticizing an employee is not an adverse action).  No tangible harm accompanied the alleged gossip and false allegations of misconduct by her co-workers because the plaintiff maintained her position, without any changes, until her termination in December of 2021.  Am. Compl. ¶ 5; see Welch, 299 F. Supp. 3d at 113 ("The D.C. Circuit has clarified that 'job-related constructive criticism' does not constitute a materially adverse action unless it is accompanied by [a] tangible harm, such as the potential that a negative performance review could affect an employee's position, grade level, salary, or promotion opportunities.") (quoting Baloch, 550 F.3d at 1199)); but see Mogenhan v. Napolitano, 613 F.3d 1162, 1166 (D.C. Cir. 2010) (holding that actions which ostracize an employee may constitute an adverse action even without tangible harm in the narrow circumstance where the employer's workload increased so that she could not file EEO complaints against her employer).  Because the plaintiff failed to connect or associate any tangible harm to the alleged gossip or false allegations of misconduct by her co-workers, see Welch, 299 F. Supp. 3d at 113, the Court must dismiss the plaintiff's claim of disability discrimination to the extent that it is based upon the defendant having allegedly "allow[ed] the plaintiff] to be the object of gossip and false allegations of misconduct by co-workers."  Am. Compl. ¶ 21.

Second, the plaintiff alleges that the defendant used "Skype as a time clock for [the] plaintiff as a disabled employee working remotely[,]" and that she complained "about her management using Skype as a devi[c]e to monitor her time and attendance" in her complaint.  Id. ¶¶ 12, 21.  However, using "Skype as a time clock for [the] plaintiff as a disabled employee working remotely," id., does not constitute an adverse action, as its use to monitor the plaintiff

did not affect the "terms, conditions, or privileges" of her employment.  42 U.S.C.  § 2000e-2(a)(1); see Ginger v. District of Columbia, 527 F.3d 1340, 1343 (D.C. Cir. 2008) ("An employment action does not support a claim of discrimination unless it has 'materially adverse consequences affecting the terms, conditions, or privileges of the plaintiff's employment[.]'") (quoting Forkkio v. Powell, 306 F.3d 1127, 1131 (D.C. Cir. 2002)).  Because Skype monitoring is not presumptively adverse, the plaintiff must plead facts showing materially adverse consequences.  See Redmon, 80 F. Supp. 3d at 87 (holding that when an action is not presumptively adverse, such as hiring or firing, "an employee must experience materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities").  And, the plaintiff has failed to allege any adverse consequences resulting from the Skype monitoring, because "[n]ot everything that makes an employee unhappy is an actionable adverse action[,]" Broderick v. Donaldson, 437 F.3d 1226, 1233 (D.C. Cir. 2006).  The Court must therefore dismiss the plaintiff's disability discrimination claim to the extent that it is based upon the defendant using "Skype as a time clock for [the] plaintiff as a disabled employee working remotely[.]"  Am. Compl. ¶ 21.

Third, while the proposed termination of the plaintiff does not constitute a presumptively adverse action, the plaintiff has alleged adverse consequences resulting from the proposed termination, namely, her actual termination.  Specifically, the plaintiff alleges that "[h]er immediate management initially fired her on the basis of [the] . . . proposed removal[.]"  Id. ¶ 17. Furthermore, the plaintiff alleged that even though another official rescinded "the November 30, 2021 decision to remove [the] plaintiff," that official nevertheless simultaneously "affirmed the removal decision for the same reasons given in [the] November 20, 2021 decision[.]"  Id. ¶ 18. Thus, the proposed termination had "materially adverse consequences affecting the terms,

conditions, or privileges of [the plaintiff's] employment[,]" Forkkio, 306 F.3d at 1131, as her

ultimate termination—based on the same reasons—constituted a "significant change in [her]

employment status[,]" Redmon, 80 F. Supp. 3d at 86 (quoting Taylor, 350 F.3d at 1293), which

courts in this Circuit have long considered to be presumptively adverse. Thus, because the

proposed termination and the ultimate termination constitute adverse actions, the Court must

consider whether these adverse actions were taken because of the plaintiff's disability.

### 2.   Whether the Plaintiff's Proposed Termination and Ultimate Termination Occurred Because of Her Disability

Although the plaintiff's proposed termination and ultimate termination constitute adverse

actions, the Court concludes that the plaintiff has failed to plausibly allege facts showing that

these actions were taken "solely" because of her disability. Drasek, 121 F. Supp. 3d at 154

(explaining that the "solely" language in the Rehabilitation Act requires a more stringent

standard, which is the but-for causation standard). The plaintiff alleges that the "decision to

remove [her] from her employment and from the federal service . . . was, like the earlier decision

by a lower level official[,] motivated by a continuing effort to discriminate against [the] plaintiff

due to her disabilities[.]" Am. Compl. ¶ 19. However, under the Rehabilitation Act, the fact that

the plaintiff's disability was a motivating factor in these decisions is not enough. See Drasek,

121 F. Supp. 3d at 154. Furthermore, to the extent that the plaintiff relies on the fact that the

defendant was aware of her disabilities, see Am. Compl. ¶ 11 (alleging that "all of the[] [US]CIS

officials and their successors were aware of [the] plaintiff's disabilities[,]" that Fabienne

Corcoran "was fully awar[e] of [the] plaintiff's disabilities[,]" and that the official who decided

to terminate the plaintiff's employment "was fully informed as to [the] plaintiff's disabilities"),

awareness alone does not establish that the employer's knowledge of the plaintiff's disability

caused the adverse employment action, see Epps v. Potomac Elec. Power. Co., 389 F. Supp. 3d

53, 63 (D.D.C. 2019) ("[The] mere fact that an employer is aware of an employee's impairment

is insufficient to demonstrate either that the employer regarded the employee as disabled or that

perception caused the adverse employment action.") (internal quotation marks omitted) (quoting

Kelly v. Drexel Univ., 94 F.3d 102, 109 (3d Cir. 1996)).

Thus, even recognizing that the plaintiff's burden to establish a prima facie case of

discrimination "does not apply with full force at the motion to dismiss stage [of the case,]"

Thomas v. Wash. Metro. Area Transit Auth., 305 F. Supp. 3d 77, 84 (D.D.C. 2018), the Court

finds that the plaintiff's allegations do not constitute sufficient evidence to establish an inference

of discrimination based on her disability.  See Redmon, 80 F. Supp. 3d at 86 (noting that while

"[a] plaintiff[] need not establish a prima facie case of discrimination to survive a motion to

dismiss[,] '[c]ourts can . . . explore a plaintiff's prima facie case at the dismissal stage to

determine "whether the plaintiff can ever meet her initial burden to establish a prima facie

case"'" (quoting Hutchinson, 668 F. Supp. 2d at 211–12)).  Stated another way, the Court

concludes that the plaintiff has failed to "plead sufficient facts to show a plausible entitlement to

relief," Rodriguez, 922 F. Supp. 2d at 17, regarding her disability discrimination claim, and the

Court must therefore grant the defendant's motion to dismiss Count II of the plaintiff's Amended

Complaint.

## C.     Whether the Plaintiff Has Stated a Claim of Retaliation Under Title VII and the Rehabilitation Act

Next, the Court considers whether the plaintiff plausibly alleged facts to state a claim of

retaliation under Title VII and the Rehabilitation Act.  Count III of the plaintiff's Amended

Complaint alleges that the defendant violated the anti-retaliation provisions of Title VII and the

Rehabilitation Act by: (1) "unfairly harassing [the] plaintiff[;]" (2) "subjecting [the plaintiff to]

gossip and innuendoes by co-workers and managers[;]" (3) "accusing [the plaintiff] unfairly of

wrongdoing[;]" (4) "proposing [to terminate the plaintiff] from federal service on false and specious charges of misconduct[;]" (5) "firing [the plaintiff] and removing her from the federal service on those same false and specious allegations of misconduct[;]" and (6) "subjecting [the plaintiff] to an unfair investigation of false charges of misconduct[.]"  Am. Compl. ¶ 22.  In his motion, the defendant argues that the plaintiff's retaliation claim fails because (1) "several of the incidents [the p]laintiff identifies[, like] gossiping and monitoring of [the plaintiff's] attendance through Skype[,] are [ ] trivial harms that do not rise to the level of adverse actions[;]" and (2) the plaintiff's "complaint fails to raise an inference that there is a causal connection between her prior protected activity . . . and the incidents of which [the plaintiff] complains[.]"  Def.'s Mot. at 16.

> Under Title VII's anti-retaliation provision,
>
> [i]t shall be an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing[.]

42 U.S.C. § 2000e-3(a).  "Retaliation is similarly banned under the Rehabilitation Act." Harrington v. Sec'y of State, No. 18-cv-1056 (TSC), 2023 WL 2301856, at *6 (D.D.C. Mar. 1, 2023); see Walker v. District of Columbia, 279 F. Supp. 3d 246, 271 (D.D.C. 2017) (explaining that the standards articulated in the Title VII context apply to the Rehabilitation Act).  The anti-retaliation provision seeks to "prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms[,]" Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006), and "protects an individual not from all retaliation, but from retaliation that produce[d] an injury or harm[,]" id. at 67.  The standard for judging harm is an objective standard that "separate[s] significant from trivial harms."  Id. at 68.

To survive a motion to dismiss a retaliation claim, the plaintiff must plead facts to plausibly show that: (1) "[she] opposed a practice made unlawful by Title VII; (2) that the employer took a materially adverse action against [her]; and (3) that the employer took the action because the employee opposed the practice." McGrath v. Clinton, 666 F.3d 1377, 1380 (D.C. Cir. 2012) (internal quotation marks omitted). In other words, one way the plaintiff may state a claim of retaliation is by alleging facts showing that "she suffered [(1)] a materially adverse action [(2)] because [ ] she had brought or threatened to bring a discrimination claim." Baloch, 550 F.3d at 1198.

A materially adverse action is one that "dissuade[s] a reasonable worker from making or supporting a charge of discrimination." White, 548 U.S. at 68 (internal quotation marks omitted) (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). Typically, material adverse actions involve "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." Taylor, 350 F.3d at 1293 (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998). However, "[u]nlike the antidiscrimination provision, the antiretaliation provision is not expressly limited to actions affecting the terms, conditions, or privileges of employment." Chambers, 35 F.4th at 876. Rather, the provision should be "limited to 'employer actions that are likely to deter victims of discrimination from complaining to the [Equal Employment Opportunity Commission ("]EEOC["]), the courts, and their employers.'" Id. at 877 (quoting White, 548 U.S. at 68). However, harms that are too speculative do not constitute materially adverse actions. See Bridgeforth v. Jewell, 721 F.3d 661, 664 (D.C. Cir. 2013).

The plaintiff alleges that she engaged in statutorily protected activity at various times from 2018 until 2021, when she was terminated.  See Am. Compl. ¶¶ 4, 10–12, 17–19.  First, the plaintiff alleges that, in 2018, "[she] was a witness [ ] in an administrative EEO complaint brought by a co-worker at [US]CIS[,]" and that she "complained to her supervisor that [USCIS] management was improperly using Skype as an attendance tool for her as a disabled person working from home[.]"  Id. ¶ 10.  The plaintiff alleges that, in late 2019, she "initially contacted an EEO Counselor at DHS[,]" id. ¶ 4, and later in 2020, she "lodged her first formal administrative EEO complaint of disability discrimination and retaliation for asserting her rights under the Rehabilitation Act[,]" id.  Each of these allegations constitute instances in which the plaintiff "brought or threatened to bring a discrimination claim[,]" Baloch, 550 F.3d at 1198—or in the case of the plaintiff testifying in an administrative proceeding, supporting a co-worker's discrimination claim—and thus, constitute protected activity for purposes of her retaliation claim.  Accordingly, the Court must determine whether the plaintiff has adequately alleged adverse actions which occurred because of her protected activities.  The Court will address each of the adverse actions alleged by the plaintiff in turn.

1. **The Plaintiff's Allegations That She Was Harassed, Subjected to Gossip, and Accused Unfairly of Wrongdoing by Co-Workers**

Regarding the plaintiff's allegations that she was unfairly harassed, subjected to gossip, and accused unfairly of wrongdoing by her co-workers, see Am. Compl. ¶ 22, the Court first notes that the plaintiff fails to allege what actions the defendant took that allegedly caused her co-workers to act as she claims they did.  See LaRochelle v. Lynott, No. 22-cv-115 (TSC), 2023 WL 6215365, at *8 (D.D.C. Sept. 25, 2023) (rejecting the plaintiff's ADA claim where the plaintiff "fail[ed] to allege facts linking [her protected] activity to an adverse employment action of any sort").  The plaintiff merely states that "[a]s a disabled employee working from home as

24

part of a reasonable accommodation, [she] became the subject of gossip and speculation among her co-workers regarding how she spent her time and her personal activities[,]" and thus does not allege any connection between the actions of her co-workers and any alleged misconduct on the part of the defendant.  Am. Compl. ¶ 13.  Moreover, the Court agrees with the defendant that these alleged adverse actions—viz., being subjected to gossip and accused unfairly of wrongdoing by her co-workers—are merely trivial harms, which do not rise to the level of a materially adverse action.  See, e.g., Russell v. Principi, 257 F.3d 815, 818 (D.C. Cir. 2001) ("[N]ot everything that makes an employee unhappy is an actionable adverse action."); Taylor, 350 F.3d at 1293 (noting that materially adverse actions typically involve "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change of benefits" (quoting Burlington, 542 U.S. at 761)).  Therefore, the Court concludes that the alleged conduct of the plaintiff's co-workers does not rise to the level of material harm sufficient to constitute an adverse action.

### 2.  The Plaintiff's Proposed and Actual Termination

Next, regarding the plaintiff's proposed termination and the termination itself, the defendant acknowledges that these actions rise to the level of materially adverse actions, see Def.'s Mot. at 15, but nevertheless argues that "the temporal gap from 2018 until the incidents giving rise to [the p]laintiff's claims in 2021 is [too long], as is the gap from 2019 ([the p]laintiff's second EEO contact) until 2021[,]" id. at 20.  "To establish a causal connection between the engagement in a protected activity and the retaliatory action—in the absence of direct evidence—a plaintiff may show 'that the employer had knowledge of the employee's protected activity, and that the [retaliatory] personnel action took place shortly after that

activity.'" Doe 1 v. George Wash. Univ., 369 F. Supp. 3d 49, 73 (D.D.C. 2019) (RBW) (quoting Cones v. Shalala, 199 F.3d 512, 521 (D.C. Cir. 2000)).  And, "[f]or purposes of establishing a prima facie case of retaliation, 'temporal proximity can indeed support an inference of causation, but only where the two events are very close in time.'"  Hamilton v. Geithner, 666 F.3d 1344, 1357 (D.C. Cir. 2012) (quoting Woodruff v. Peters, 482 F.3d 521, 529 (D.C. Cir. 2007)); see also Singletary v. District of Columbia, 351 F.3d 519, 525 (D.C. Cir. 2003) (holding that "a close temporal relationship may alone establish the required causal connection" for retaliation claims).  Furthermore, "[a]lthough 'neither the Supreme Court nor [ ] this Circuit has established a bright-line three-month rule,' this Circuit has found that such a gap between the protected activity and the adverse employment action negates the temporal proximity needed to prove causation[.]"  Doe 1, 369 F. Supp. 3d at 73–74 (quoting Hamilton, 666 F.3d at 1357–58) (internal citation omitted).

The Court agrees with the defendant that the time between the plaintiff's alleged protected activities and her proposed and final termination fail to support an inference of retaliation because the temporal gap is "too wide."  Def.'s Mot. at 19.  The plaintiff's testimony in support of her co-worker's EEO complaint occurred in 2018, see Am. Compl. ¶ 10, her first contact with an EEO counselor occurred in late 2019, see id. ¶ 4, and she filed her formal EEO complaint in March of 2020, see id.  However, her proposed and actual termination occurred in 2021, see id. ¶¶ 17–18—approximately one to three years removed from each of the three alleged protected activities—periods of time which are much longer than courts in this Circuit generally consider to be sufficiently close in temporal proximity, see, e.g., Pauling v. District of Columbia, 286 F. Supp. 3d 179, 208 (D.D.C. 2017) (holding that five months between the protected activity and alleged retaliation does not constitute the temporal proximity necessary to

show a causal connection); see also Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273–74 (2001) (citing Circuit decisions suggesting that in some instances a three-month period between the protected activity and the adverse employment action, alone, may be too long of a period to raise an inference of causation).  Furthermore, the plaintiff provides no additional facts in her Amended Complaint which could "permit an inference of retaliatory motive[,]" McKenna v. Weinberger, 729 F.2d 783, 790 (D.C. Cir. 1984), regarding the alleged connection between her testimony, contact with an EEO counselor, or EEO complaint, and her proposed and actual termination.  See generally Am. Compl.

Accordingly, although the plaintiff's proposed and actual termination constitute adverse actions, the Court concludes that it must grant the defendant's motion to dismiss the plaintiff's retaliation claim to the extent that it is based on these adverse actions because the plaintiff has failed to adequately allege that these adverse actions occurred because of any of her protected activities.  See generally Am. Compl.

### 3.  The Defendant's Investigation of the Plaintiff Regarding Charges of Misconduct

Finally, regarding the plaintiff's allegation that the defendant retaliated against her by "subjecting her to an unfair investigation of false charges of misconduct[,]" id. ¶ 22, the defendant argues that "there is no allegation that [the p]laintiff's managers were aware or would have been made aware of [the p]laintiff's informal contact [with an EEO counselor,]" Def.'s Reply at 11 (citing Baloch, 550 F.3d at 1196), and that even if her managers were aware, "beginning an investigation into [the p]laintiff's [ ] misconduct similarly does not on its own, qualify as an adverse action[,]" id. (citing Baloch, 550 F.3d at 1196).

Regarding the threshold question of whether the defendant's initiation of an investigation of the plaintiff constituted an adverse action, "while the mere initiation of an investigation is

generally not sufficient to constitute adverse action for a retaliation claim, an investigation which carries the prospect of material consequences for the plaintiff may constitute adverse action." Congress v. District of Columbia, 514 F. Supp. 3d 1, 18 (D.D.C. 2020) (internal quotation marks omitted).  "[T]he touchstone of material adversity[,]" id., is whether a particular action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination[,]" White, 548 U.S. at 68  (internal quotation marks omitted).  See Velikonja v. Gonzales, 466 F.3d 122, 124 (D.C. Cir. 2006) (holding that a lengthy investigation that "place[s] a cloud" over an employee's career could dissuade a reasonable worker from making or supporting a charge of discrimination).  Here, the Office of Security and Investigations ("OSI") investigation resulted in the termination of the plaintiff's employment, see Am. Compl. ¶ 17 (noting that the "initial allegations that were investigated" and her "lack[ of] candor in explaining herself during the investigation" were "found to be justification[s] for firing [the] plaintiff" (internal quotation marks omitted)), and thus carried the prospect of material consequences that would dissuade a reasonable employee from making or supporting a charge of discrimination, see Congress, 514 F. Supp. 3d at 18–19 (holding that an investigation that "carr[ies] the prospect of serious consequences for employees, up to termination . . . constitutes [a] relevant adverse action for [the plaintiff's] retaliation claim").  Accordingly, the Court concludes that the defendant's investigation of the plaintiff's conduct constituted an adverse action.

However, the Court concludes that the plaintiff, through her Amended Complaint, has failed to plead facts which permit an inference that her managers were aware of her informal contact with an EEO counselor.  See generally Am. Compl.  The plaintiff alleges that she has provided additional facts in her request for leave to amend her Amended Complaint—contained in her opposition to the defendant's motion—which support this inference.  See e.g., Pl.'s Opp'n

28

at 15 ("Regarding the investigation . . ., Plaintiff contends that[] her managers were aware of her real estate activities for years but did not initiate an OSI investigation until January 2020, within a month of the date [in] early December when she both (1) complained to [the defendant] about taking away her cell phone and (2) requested that she be allowed to continue to use the cell phone as an accommodation for her disabilities[.]"); id. ("[H]er managers were aware of her real estate activities for years but did not initiate an OSI investigation until January 2020, within a month of the date she filed her informal EEO complaint on December 23, 2019[.]").  Thus, the Court will address this aspect of the plaintiff's retaliation claim in the context of the plaintiff's request for leave to amend her Amended Complaint.

   a.   **The Plaintiff's Request for Leave to Amend Her Amended Complaint Pursuant to Federal Rule of Civil Procedure 15(b)(2)**

In her opposition to the defendant's motion, the plaintiff includes additional facts not alleged in her Amended Complaint and requests leave to amend her Amended Complaint "[i]f the Court deems these additional facts need to be included in the Complaint, pursuant to [Rule] 15(b)(2)."  Pl.'s Opp'n at 2 n.1.  "Although not stated in the Amended Complaint," the plaintiff represents in her opposition that the "[d]efendant has investigated [the p]laintiff's claims and created two separate Reports of Investigation (ROI) that comprise several hundred pages of documents.  The ROIs [the defendant allegedly] created supply details for the bases of [the p]laintiff's [Amended] Complaint[.]"  Id.  The plaintiff argues that she included these "facts [in her opposition to the defendant's motion] that were not fully described" in the Amended Complaint because "of the issues raised in [the d]efendant's arguments[.]"  Id.  In response, the defendant argues that "[t]he Court should [ ] decline to consider new claims and/or allegations that are not included in the operative complaint" because "[i]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss[,]" Def.'s Reply at 2 (quoting

<u>McManus v. District of Columbia</u>, 530 F. Supp. 2d 46, 74 n.25 (D.D.C. 2007)), and that the

"[p]laintiff's reliance on information contained outside the four corners of the complaint is [ ]

misguided and inappropriate at [the motion to dismiss] stage[,]" <u>id.</u> at 3.  Furthermore, the

defendant states that "even if the Court were to consider [the p]laintiff's . . . request to file an

amended complaint[,] . . . it is apparent from [the p]laintiff's filing that any such amendment

would be futile."  <u>Id.</u>

  The defendant is correct that "[i]n ruling upon a motion to dismiss for failure to state a

claim, a court may ordinarily consider only 'the facts alleged in the complaint, documents

attached as exhibits or incorporated by reference in the complaint, and matters about which the

Court may take judicial notice."  <u>Yang v. Spahn</u>, 2023 WL 1861076, at *1 n.3 (D.D.C. Feb. 9,

2023).  Furthermore, "[i]t is well settled law that a plaintiff cannot amend his or her complaint by

the briefs in opposition to a motion to dismiss."  <u>Kingman Park Civic Ass'n v. Gray</u>, 27 F. Supp.

3d 142, 160 n.7 (D.D.C. 2014).  Here, the plaintiff concedes (1) that her additional facts—<u>i.e.</u>,

the defendant's Reports of Investigation—were "not stated in the complaint[,]" Pl.'s Opp'n at 2

n.1, and (2) that she only moved to amend her complaint in her opposition to the defendant's

motion to dismiss, <u>see id.</u>  However, in rare instances, members of this Court have been willing

to exercise their discretion to excuse such mistakes—<u>i.e.</u>, where the plaintiff was proceeding pro

se.  <u>See e.g.</u>, <u>Judd v. Serv. Emps. Int'l Union, Loc. 32BJ</u>, 2020 WL 5702088, at *8 (D.D.C. Sept.

23, 2020) (allowing pro se plaintiff, who improperly moved to amend his complaint in his sur-

reply, the opportunity "to file a motion seeking leave to file an amended complaint within 30

days" of the filing of the court's memorandum opinion and order); <u>Richardson v. United States</u>,

193 F.3d 545, 548–49 (D.C. Cir. 1999) (construing a pro se plaintiff's reply brief "to constitute

an amendment to his original complaint" where there was "the lack of any evidence of prejudice to the [defendant]").

Given that the plaintiff here is represented by counsel, the Court questions whether it should exercise its discretion to excuse the plaintiff's error—viz., whether it should allow the plaintiff the opportunity to "file a motion seeking leave to file an amended complaint" at a later date, Judd, 2020 WL 5702088, at *8. However, the Court lacks information regarding the contents of the Reports of Investigation ("ROIs"), when the plaintiff became aware of the ROIs (i.e., whether the plaintiff had access to these ROIs before filing her Complaint), and any other potentially mitigating reasons for the plaintiff's error. Given that the plaintiff alleges that the additional facts contained in the ROIs could support her retaliation claim based upon the defendant's investigation as an adverse action, the Court will allow the plaintiff to submit supplemental briefing as to why the Court should excuse her error. See, e.g., Saunders v. District of Columbia, No. 02-cv-1803 (CKK), 2005 WL 3213984, at *8 (D.D.C. Oct. 25, 2005) (holding one of the plaintiff's claims "in abeyance to give the parties an opportunity" to file supplemental briefing "[d]ue to [the plaintiff's] failure to fully brief the claim on [certain] issues"). The plaintiff shall respond in accordance with the schedule and page limitations set forth in the accompanying Order.

Accordingly, pending the submission of the plaintiff's supplemental briefing, the Court will deny without prejudice the defendant's motion to dismiss Count III of the Amended Complaint, to the extent that Count III is based on the plaintiff's informal complaint in 2019 as

the relevant protected activity and the defendant's investigation into the plaintiff as the relevant adverse action.[4]

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that it must grant in part and deny without prejudice in part the defendant's motion to dismiss.

**SO ORDERED** this 15th day of November, 2023.[5]


REGGIE B. WALTON
United States District Judge

---

[4] The Court notes that consideration of the additional facts alleged in the plaintiff's opposition would have no effect on the Court's rulings regarding her reasonable accommodation and discrimination claims, see supra Sections III.A, III.B.  Furthermore, the Court similarly concludes that those additional facts would have no effect on the Court's resolution of the plaintiff's retaliation claims, to the extent those claims allege retaliation based on (a) the plaintiff's allegations that she was harassed, subjected to gossip, and accused unfairly of wrongdoing, and (b) her proposed and actual termination.  Accordingly, the Court sees no reason to abstain from ruling on the defendant's motion to dismiss those claims, as their resolution does not turn on whether the Court allows the plaintiff to amend her Complaint to include the additional facts referenced in the ROIs.  Cf. In re Interbank Funding Corp. Sec. Litig., 629 F.3d 213, 218 (D.C. Cir. 2010) ("[A] district court may properly deny a motion to amend if the amended pleading would not survive"); see also James Madison Ltd. v. Ludwig, 82 F.3d 1085, 1099 (D.C. Cir. 1996) ("Courts may deny a motion to amend a complaint as futile . . . if the proposed claim would not survive a motion to dismiss.").

[5] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.